sued in his official capacity administrator wage hour division et al. appellants. Ms. Klein for the appellants, Mr. Baskin for the appellees. Good morning. Good morning. May it please the court, Elisa Klein for the United States. As the court is aware, the plaintiff's  challenge to regulations that implement the 1974 amendments to the Fair Labor Standards Act. In relevant part, those amendments extended FLSA coverage to domestic service employees generally, but accepted certain categories of workers, including companionship workers and live-in domestic service employees. The district court declared that the regulations are contrary to the plain text of the statute and invalidated the regulations at Chevron step one. Those rulings rest on a fundamental misunderstanding of the Supreme Court's decision in Koch. In Koch, the Supreme Court specifically addressed the question of third-party employment, and it concluded that the text of the companionship services exception does not decide how to treat workers who are paid by third parties, such as the businesses that plaintiffs represent. Instead, the Supreme Court determined that there are a set of complex questions about whether the exception should cover all of those workers paid by third parties, some of them, or none of them. And the court said this is an interstitial matter. It's a matter in which the Department of Labor has subject matter expertise and can decide in consultation with the affected parties. And the court concluded, it's therefore reasonable to infer, and we do infer, that Congress delegated authority to answer these questions to the Department of Labor through rulemaking. So, in Koch, did the court have before it any aspect of the live-in part of the statute and regulations? And I will separately address live-in. The relevant language is the same, or almost identical. If you look at the first page of the Koch opinion, the language of the companionship services exception, it's quoted in the first sentence of the Koch opinion, any employee employed in domestic service employment. And so the parallel language in the live-in exception is any employee employed in domestic service. It's the same. And that was the phrase that was the subject of the briefing in the Supreme Court. So the live-in statute doesn't have the grant of authority for definition and delimitation? Your Honor is correct. So just two separate points. So the question before the Supreme Court in Koch was, does that phrase, any employee employed in domestic service employment, answer the issue of how do you treat workers employed by third parties, like the plaintiff businesses? And the Supreme Court decided it doesn't answer that question, and nor does the legislative history answer the question. And the Supreme Court, in saying that the authority rests with the Department of Labor to answer that question, not only cited the define and delimit language, but also relied on the general grant of rulemaking authority in the 1974 amendments, which is the typical language that bests an agency with legislative rulemaking authority. And that grant of authority applies equally to the rest. What was the record that the Department of Labor had before it when it made this, when it said that even live-ins are now going to get the benefit of minimum wage and overtime? Okay, so this is in the current regulations. Yes, yes, yeah, yeah. Well, so first there's just the statutory question that the authority is the same. And then the Department reviewed the comments, and there were not a lot of comments about live-in. But to the extent there were comments, they did not provide any basis for carving out and treating differently live-in domestic service employees. Because generally the comments reflected a misunderstanding of just the ordinary background rules for how you would compensate live-in domestic service employees. There was a suggestion, you know, that they may be sleeping through the night. And the answer is yes. And if that's true, that's not hours worked. There can be voluntary agreements that exclude those hours. Well, I mean, are there live-in domestic employees who are not hired by third parties? I mean, who are non-vocational? They're probably yes, but the industry, those are requests for data, and the industry did not supply data that focused on live-in domestic service employees. And, again, as I said, there were relatively few comments on live-in domestic service employees. And to the extent there were comments, they both misunderstood the meaning of live-in. The industry comments tended to equate live-in with a 24-hour shift. That's not correct, and this is under longstanding principles. And then also misunderstood that they already can take a credit for, you know, room and board. That can count towards wages. So essentially what was in there provided no basis to differentiate the live-in workers. On the authority question, just back on the authority question one second. So I guess one way to read Koch is to say that it deals solely with the companionship services aspect of the statute and regulations. And it does, when it talks about authority, the first thing it cites understandably is the companionship services provision itself. And then it says C, the background grant of authority. So insofar as one were to think that what the court is saying is the relevant grant of authority comes from the statutory language that grants to the secretary the authority to define and delimit. And then, you know, that authority is reinforced by the background statutory authority, but it's a reinforcement rather than an affirmative and independently sufficient grant of authority. Then there would be an open question as to the live-in part of the statute. So here's why that's mistaken. Yeah. You know, the FLSA has a long list of exceptions. Only two, I believe, companionship services and the exception that the Supreme Court addressed in our, you know, for administrative, executive, professional, use that term, the define and delimit language. However, it's always been understood that the Department of Labor has general legislative rulemaking authority to fill any gaps left in those provisions. It's exercised it specifically with respect to live-in domestic service employees, but also, you know, that long list of exceptions. So is that define and delimit language just redundant then? I don't know the answer. My best inference is that Congress used it to signal that this wasn't a term of art that Congress was intending to define. You know, companionship services didn't have a predefined meaning, and that instead just to indicate this was a term for the Department of Labor to define and delimit. But it sounds like your argument not only would raise a question about what work define and delimit was doing, but also what work the other provision that gives authority to implement the 1974 amendments were doing, because it sounds like you're talking about the Labor's authority to implement independent of the 74 amendments even. So is there some – Well, I'm not just talking about the 1974 Act itself gave Labor authority to prescribe all necessary regulations to implement the amendments in 1974. There's also, you know, of course, there's general rulemaking authority from 1938, 1966, et cetera. But so Congress at the very time that it adopted the live-in as well as the companionship services exceptions generally gave the Department of Labor authority to prescribe all rules and regulations as necessary to implement those amendments. And so the fact that the Supreme Court, looking at what is essentially identical language, said this text doesn't decide the question of third-party employment for companions, it follows – it wasn't specifically said by the Supreme Court, but it follows directly that the exception for live-in domestic service employees, that text doesn't answer the question. Do we know why Congress specifically accorded authority for define and delimit with respect to companionship services, but then one might say conspicuously left that authority out with respect to other statutes? This was the issue. I was just saying I don't know the answer. But the one thing is it's conspicuous that only two of the very long list of exceptions use that define and delimit, and no one has ever thought that means the Department lacks ordinary legislative rulemaking authority with respect to, you know, all of the other exceptions that are the subject of preliminary. That may be, but, I mean, there are certain canons of construction, and that's one that, you know, if Congress has specifically used the phrase define and delimit for only two of the instances and hasn't elsewhere, maybe it hasn't been challenged before, but can there be some justification? Well, again, let's go back to Koch itself. The briefing in Koch, the petitioner itself stressed that this authority to prescribe all rules and regulations, the general authority, would be an independent and sufficient ground for the Department of Labor to issue a third-party employment regulation. The government emphasized that general rulemaking authority. The Supreme Court quoted that general rulemaking authority. You know, it would be a mistake to read into what's just an Ibbitt site that essentially that the prescribed and, you know, all necessary rules is superfluous and unnecessary. This is the basic grant of rulemaking authority. It was the same language that was at issue in Brand X two years earlier. This is a very familiar grant of authority. As I recall, Koch didn't make this distinction, though, did he? I mean, Koch didn't. I mean, it turned on the define and delimit language, didn't it? No, no, not at all. Koch quoted the broader, let's see if I can find the exact page. 165, I think. Yes, thank you, yes. So after saying the FLSA explicitly leaves gaps, which is obviously the first important point, it says it provides the department with the power to fill these gaps through rules and regulations. So there's an Ibbitt site that is citing back to the companionship services provision, both to the gaps and perhaps implicitly to the define and delimit language. But then it also specifically cites the 1974 amendment, Section 29B, and it says authorizing the Secretary of Labor to prescribe necessary rules, regulations, and orders with regard to the amendments made by this act. And given the emphasis that the government and the petitioner placed on that provision, which made sense because the Second Circuit, the judgment that was reversed, had not acknowledged that separate grant of authority and it had significance to the way the Second Circuit analyzed the issue. I mean, this was not an oversight. This was a significant point both for the government and emphasized by the petitioner and then emphasized by the Supreme Court in its decision. And if we were on the live-in question, satisfied with your textual arguments, and looking at this under Chevron Step 2, the record seems clearer and more substantial on the companionship services logic. Why would the department treat companionship services differently when the companion is hired by a third-party employer than when the companion is hired directly by the person receiving care? It's a little bit less clear, just in terms of the justifications in the rulemaking, why the third-party, first-party distinction for live-in. And I understand there's a statutory exception and you have to honor that, but what's the principle logic there? Yeah, I'm glad the Court asked. So, again, stepping back to just the overarching justification, because it applies equally to businesses that have a workforce that would include live-in domestic service employees that they're assigning to particular homes. So if you go back to the 1974 amendments to the two committee reports, which are the most relevant history, and you just read the four or five pages about domestic service employees. So when Congress was extending these protections to domestic service employees generally, what it said was there's a shortage of domestic service employees, notwithstanding what was otherwise high unemployment. This is problematic. Extending the FLSA's protections to this large category of workers not only would help the workers themselves, which was obviously extremely important, but also would create a supply of skilled, available workers who could fill this need. And then when they got to the exceptions, they said, essentially, don't worry. The exceptions are not intended to cover people for whom domestic service is a vocation. These aren't the breadwinners. This isn't their means of supporting their family. So they don't implicate them. Okay, I understand that, and that's helpful to point us back to the overarching purpose. But the rule that was the new rule regarding live-ins doesn't really track that logic. It's more formal, third-party employed versus direct employed. Many direct employed live-in caregivers are presumably full-time professional people. Many of them, I would imagine, aren't. You know, someone's second cousin coming to town, elderly aunt, you know, has onset of dementia. Will you live with her while you're in graduate school and, you know, whatever. So that's more like the analog to your model in the companionship care regulation. But you haven't read it that narrowly or given that kind of a justification as far as I read it in the live-in. I think I disagree. I mean, again, the third-party employment regulation, the analysis is the same. These are people, it's their vocation. And there wasn't a contrary claim made by the industry in any of its comments to the Department of Labor on the proposed rule. And so you are talking about now by definition the type of people whom we want to attract and have a skilled workforce to increase the availability of these services and the quality of care. And, yes, there may well be some live-in workers who it could be, you know, a college student who is earning some extra money and is directly hired by the family or, you know, just some other informal arrangement. Sometimes it's a family member. But they're not working for these businesses. And so then there's just the separate question of are they providing companionship services. Oh, I wasn't talking about companionship services. I was talking about the live-in on its own. Right. Okay, yes, of course. So if they are hired directly by the family, if it's, you know, I found a college student to live here and help or, you know, a paid family member or anything like that, then that's not a third-party employment situation. Right. Right. And so it's not covered. So the new rule doesn't change anything. The new rule about third-party employers. Right, but the new rule is drawing a line, and the question is the logic of the line. And so what you're comparing is what's inside and outside, what's getting coverage and what's not. I believe it is actually parallel. So if you have a neighbor and you just arrange for the neighbor to come sit, you know, with your older parent, then, you know, as long as it's companionship services, the person is accepted. And if you find a college student to come live in your home and, you know, assist with whatever domestic service chores, then that person is also accepted. Right, but so, too, if you have a highly professionalized placement service, not an employer, but a placement service that finds you someone who is a highly professionalized live-in domestic, that person is also going to be under the exemption in contradistinction to the person who is employed by the third-party employer, right? No. No, that's what the third-party employment regulation, just like the proposal in 2001, if you have, say, you know, plaintiff's businesses, it doesn't matter whether they're placing a companion or whether they're placing a live-in mate. They cannot avail themselves of the exemptions. But I'm saying someone who is not an employer, who's just a finding service, and is going to find you someone and you're going to employ them. I'm just saying that you're going to have in the live-in situation also people who are as highly professional and who are doing it as their full-time job just as much as you are with the third party. So I'm exploring the logic of the distinction. I understand that it may be that there are individuals who, under the logic of the rulemaking, perhaps should also be covered but aren't covered. However, at least in terms of the data and the record, which, as I said, are largely about the home care workers generally and the industry did not parse out their own workers who are live-in workers and nor did anyone else. But just in general, we have the opposite universe from what we had in 1974 and 1975. As, you know, the reports to Congress that were cited in the Koch briefing explained back at that time, again, this was just about domestic service employees generally. The vast majority of domestic service employees generally were hired directly by the household and only 2% were hired through a business like the ones that are the plaintiffs here. And, you know, the petitioners themselves said it's a fair inference that the same was true of companions. They had no reason to address live-in workers, but there was nothing to suggest any difference. And so what's happened now is over, you know, the course of many decades, you've had added on to, you know, whatever was happening then, this huge industry in which businesses have workforces. These are all, you know, professional employees, and they're assigned to particular homes. And it might be just, you know, for a shift. It might be on a live-in basis. But this didn't exist at the time. And so when Congress said, don't worry, the accepted categories are not going to include workers who have domestic service as their vocation, you know, we know that's not true today for all of these, for this whole workforce that is employed by the businesses the plaintiffs represent. So, by the way, do we know why the statute with respect to live-ins affords relief only from overtime, but with respect to companion services affords relief from both overtime and minimum wage? There's almost no discussion. I mean, there's one line in the committee reports that's like, you know, this may avoid complications in the application of the law. We couldn't find anything. I did ask the client. So there was really – I don't have anything that could explain why there's that particular treatment. Okay, great. Thank you very much. We'll give you back a couple minutes for rebuttal. Mr. Baskin, good morning. Good morning. May it please the Court. Maurice Baskin for the appellees representing the home care industry. And we appreciate the Court's concern about the live-in issue, which is frankly unexplained in the record or in the statute, but certainly unexplained why the Department tossed it in and tossed aside third-party employers excluding them from it when most of the states, even those states that have adopted some form of exemption, have exempted the live-in employees from any third-party exclusion. But before one reaches this issue on either third-party or companionship, we really ask the Court to address and consider what the district court found, which is that the method that the Department adopted is in clear violation of the plain language. It's a method that in the broader context of the FLSA has never been tried before. Mr. Baskin, just let me ask you while I'm thinking about it. Do your members employ – is there anything in the record that shows that your members do employ live-in? Yes, they do. In terms of hard numbers, there's really nothing in the record about the specific percentages. We know that it's more than 90 percent of the caregivers as a whole are employed by third-party employers. There's not an explicit division between companionship types and live-in types with regard to that. I want to hear your Chevron step one argument. Absolutely. Because this is particularly in light of the statutory language of delimit and define, right? And more importantly, in light of the Supreme Court decision in Koch, which the district court didn't thoroughly address, I don't think. Well, one has to understand that our argument is different fundamentally from what was brought up in Koch because the Department has done something fundamentally different. It did not attempt even to define or delimit any term in that exemption statute. They did not define or delimit employees. So I think they did it this way to try to avoid the problem of the word any employee. So they said, we have an idea. We'll go after the employers who are not referenced in that statute. That's not that convincing given that Koch already dealt with any employee and said it isn't an obstacle in the way that you're positing they may have perceived it to be an obstacle before Koch. When they're writing this regulation, they didn't need to worry about that. And it seems a little semantic to say, well, it wasn't framed in terms of definitional. It is giving meaning to the scope of the exemption. But in the broader context of the FLSA, if the Department takes onto itself the authority never before exercised, not just talking about this provision, anywhere in the Act, to say that certain groups of employers cannot avail themselves of exemptions that Congress has created, it's in total contradiction to the language of the beginning of 213, which says that 207, the only place where the obligation to pay overtime, simply does not apply if the employees fit within the definition. So the Department is charged with regulating and defining, delimiting employees. It is not entitled, if that definition stays as it is, of employees. It's not entitled to deny employers exits. So what if the regulation said, with regard to employees of the following employers, and then it says these employers can't avail themselves of the exemption, then the regulation would be making an explicit tie between the employers and the employees. If it had done that, we would be having a different case. Although, even in that situation, they're saying employers. But let me pause to you. Well, so did the initial regulation also refer to employers, the one that fenced in? No. If you look at it, it described the employees. It said employees of the employers. That's exactly right. Employees of the employers will be covered by the exemption. They have not simply flipped it around here. They did something different. So I guess what I'm asking is, I think what I was trying to posit was the flip, which is that they make an explicit link between employers who are explicitly referenced and the employees of those employers who are implicitly referenced. That would be a closer case. We're not at that. So does that take into account? Because in this case, they do not redefine employees. They say employers, and that's all that the section says. They're talking about employees of third-party employers. They're not talking about just the employer itself. Well, that's the whole point. Let me posit to you this way. If they had said we are going to change this definition because we think Congress was flat wrong, we are doing it in defiance of Congress. Well, what if they say, I mean, I think that it feels a little semantic, your point, because it seems like you could easily have framed the same regulation and said employee in the context of this exemption means an employee that's directly employed by the household. Same result, right? One has to ask why they didn't do it that way. Because it's common parlance under the Fair Labor Standards Act to talk about employers and failing themselves of this and that, not tip exemptions, for example. Well, and I guess I didn't make this point strong enough in the breeze. It has never been done under the FLSA. They have never used this language before. Well, can I ask this question? So that argument, even if we think that there's a meaningful difference between employers and employees of employers, that rests on the define and delimit authority granted in the statute. And part of the argument here is that it's not just the define and delimit authority. There's a background authority to implement the amendments. And if you have a background authority to implement the amendments, and you think that that was doing work in Koch, then I don't know that you have such a strong argument about employees versus employers, because at that point you're not talking about defining a term. Well, there you turn to the Colorado River case, which makes clear this Court's case. It says that you can't, the general rulemaking authority does not relieve the Department of the obligation to do it by the means that Congress set forth. Congress set forth the means, define and delimit employees and other terms in that section of the statute. Congress did not give the Department the authority to deny categories of employers access. No, but I'm saying that we're not talking about the define and delimit authority anymore. Or the general rulemaking. Colorado actually dealt with, specifically, the morning-type argument of that case, saying, well, they have the general rulemaking authority. And this Court, not only in that case, but in the National Association of Manufacturers case against the NLRB, a couple of years ago, said general rulemaking authority, that's not enough, if it's going outside the means and methods and the specific goals that Congress set forth. So, and that takes us back to something else that Koch did that the Department has seemingly ignored. Koch foreclosed the legislative intent argument. That's part of the holding. They said, we're not convinced by these claims that Congress did not intend to include third-party employers. But the rule itself, on no less than 30 occasions, says that the reason for this rule is because the Department has decided that, notwithstanding what the Supreme Court said, Congress did not intend to allow third-party employers to have access to this exemption. That takes it, first of all, that part is foreclosed by Koch. I think they're looking at it, well, they could be taken to be looking at it at a level, one higher level of generality. But the Congress didn't have an intention in particular about third-party employers versus direct household employment. But it did quite clearly have an intention about professionalism versus more casual workers. And so I think what the delegation, the work the delegation is doing, together with the changed circumstances that the Department perceives out in the working world, is to say, if professionalism is Congress's goal, we the Department have it wrong in the 1975 regulation. We need to capture more of the people that Congress was aiming at to get these protections through the new rulemaking. Your Honor, that is a terrible reading of what they wish they had said. But I regret, respectfully, they did not say it that way. Time after time, and one can simply do a word search, so I can go to the number 30, think of the word congressionally, intent. And just by one example, we are doing this, and this is on page 60455, we are doing this to give effect to Congress's intent in 1974 to expand coverage to domestic service employees rather than to restrict coverage for a category of workers already covered. That is exactly the language that the Court said was not an expression of, was not what Congress intended. And when the Department has acted based on a misunderstanding of congressional intent, you get into the arbitrary and capricious aspect of this case. They are relying on a factor that Congress did not intend them to rely on. And in that event, that's an alternative reason why this rule cannot stand. It is based on a fundamentally false premise. They did not say, Coke left us a gap, and Congress could have allowed us to go either way, so we'll go this way now. They said over and over again, we're doing this because, not just biographical or historical, they say they're doing it because Congress intended them to do it and intended to exclude the third party. You're talking about what happened in the 1970s. No, I'm talking about what the Department has said in this rulemaking. In the 2013 rulemaking? In referring back to the 1970s. In referring back, correct. Right. Which is, that's the only legislative intent we've got, although it is supplemented by the Congressional Reenactment Doctrine, which we cited numerous cases that the Department failed to distinguish other than the regrettable incident of citing the dissenting opinion of another case. But the Congressional Reenactment Doctrine indicates that it's further persuasive evidence of what the original intent was, and we have both active and inactive. We have enactment of new statutory exemptions, and we have rejection of specific attempts by a minority party to overrule Coke, which failed, never made it out of committee. But it's not just that rejection. It's the reenactment. It's the longstanding interpretation. It fits exactly within Bell Aerospace, the Auburn Medical cases decided by this Court. All of the factors are together. And so it contradicts the Congressional intent that the Department relied on, and again, did not just casually mention. Yes? I wonder if you, if your members, if your organization has standing, has standing to raise the interest of the CDAP providers. We have, you know, several amicus briefs talking about how this can interact with publicly funded care. Well, it goes to the arbitrary and capricious aspect, and so therefore it is. Just the narrower question, do you, do your members provide caregivers under the CDAP programs? Yes, they can. And because it is consumer-directed programs, the consumer could direct to use a third-party employer. Sorry, I misunderstood your question. No doubt about that. And, in fact, it raises the whole issue, another aspect of the arbitrariness of this rule, the failure of the Department to make sure there's funding in place for it. The Medicaid issue that the Department said, and some of their amicus said, well, we don't have to consider that now. We don't have to solve that problem now. But that is what the consumers are relying on, many of them, for their lives. And without that funding, the states are strapped. They are not ready. There is chaos threatened in this industry. So if under CDAP, Medicare is the employer, you would also be a joint employer? There is a distinct possibility of joint employment status, not only by us, but by the state governments. They're worried about that. Again, it's sort of alluded to. The Department says, well, it's a risk we'll take, you know, easy for them to say. But they are required to address all aspects of the problem. That's another factor from the State Farm case that they have failed to address here. The bottom line is they would have you believe that Congress went to all the trouble to create this exemption in 1974 just so that the Department could come back 40 years later and eradicate it, repeal it. And make no mistake, that's what they've done. Based on that, just describe in that way, if you look at that paragraph on pages 167 and 168 of the opinion in Koch, it looks like the Supreme Court contemplated, at least contemplated exactly that result because it said it could be some, could be none, could be all. It certainly didn't say that we're not going to review it if it comes back to us in one of those extreme forms. Of course they'd review it. And that they would have to meet all the reasonable standards of arbitrary and capriciousness. And, of course, I'll reiterate that the court was not considering, they were considering a law that exempted people. And they said that rule, rather, was valid and binding. And that was the holding of the case. But they also indicated that. They certainly went on and asked a series of other questions and left these openings for the Department to drive a truck through. But it's not a highway that leads in a positive direction for the entire industry and for the disabled and elderly people who are in desperate need of these services. They've taken an industry that has been a great success story to achieve exactly what Congress wanted, which was to allow people to no longer re-institutionalize and to come stay in their homes and get help. And now they are threatening to destroy it. Which is in the vein, I don't take those arguments lightly by any stretch, but that's in the vein of a Step 2 argument, not a Step 1 argument. Yes, it is. Absolutely. But you don't have to reach Step 2, and you really should not reach Step 2, for multiple reasons. One is that the rule here is not the flip side. I just can't say that strongly enough if one reads the overall context of the act. They live in issue, no justification at all, no define and delimit language. You have congressional intent, completely mischaracterized by the Department in this brief and in the rule itself, and failure to address the very serious problems that are resulting from this rule. And we haven't even gotten into the definition. You know, when I said all, when I said repeal and eradicate, 90% are third-party employees, but whatever's left is wiped out by the reduction to 20% of the care provision. Do you employ, do your clients' members employ people who fit under the revised and narrowed companionship care definition? Oh, absolutely. That's why we go on to that. Who would continue to qualify for the exemption under the revised.  Sorry, misunderstood what you're asking. You're not really providing people who are mainly there for companionship and fellowship and protection and not for also care. Now, the record, and I can't say never say never, there are thousands of employees and employers around the country, but the testimony of all of the plaintiffs and many others is that care, the type of basic grooming, and we're not talking about nursing care, we're talking about dressing, the ADL and IADL. Day-to-day care. Correct. And you're talking. That is what it consists of now. What is now in the 20% under the companionship and fellowship. Absolutely. You can't get that care. And that is what it consisted of then. All the talk about some changes in the industry has really amounted to that there are more older people and more disabled people who are getting more quality home care. But in terms of the type of things that people are doing, these are not professionals. They are simply better trained and better certified. If they were professionals, they would be under a different exemption. They are doing basic grooming. Not professionals in that sense, but people who are working people for whom this is their vocation and their career. Yes, but, you know, they refer to that, but there's nothing in the legislative history of the exemption that excludes, uses that term vocation. It's only under the domestic services section, not under the companionship exemption. So it's another mischaracterization, I'm afraid, of what Congress intended. But we shouldn't even be talking about what Congress intended because the Supreme Court already settled that question. Congress did not intend to exclude third-party employers. That is a, you think you're really mixing apples and oranges there, because the court is saying can we rely on this congressional intent for us, the court, to override what the agency with delegated authority is deeming to be, you know, given the facts of the world, carrying out a congressional intent. Whereas here we're talking about the agency exercising its delegated authority. Those are very, very different questions. You know, what level of clarity of congressional intent the court would require to override a regulation versus what level of congressional intention an agency would need to carry out the purposes of the act. Those are really two different questions. They're not unrelated. I understand that. Well, but when, you're right that they're two different questions. But when the agency declares that they are acting because of a misguided notion of congressional intent that the Supreme Court said in, look, I'm looking at the paragraph. These, on page, well, my page, I think it's the Supreme Court version 2347, where the respondent said what she was saying about the legislative intent is exactly the same thing that the department is saying here in the rule. And the department says because of that, which the Supreme Court found unconvincing. I'm sorry, I believe those are very relevant. The reason she's saying that is because when we read the congressional reports, and indeed it was Congress's intent in the entire domestic service provision to give wage and hour protection to people who were doing this as their bread and butter in their full job. And, you know, so. Except, except in the companionship exemption. They did not have that intent. And every court that's looked at it has said that they did not have that intent. And now the department is saying, no, no, all the courts are wrong, including the Supreme Court. They did have that intent, and that is why, that is the reason, that's the number one, if not the only reason why they're doing this. They are changing all the rules and essentially repealing the exemption that Congress actually wrote. I see my time is up, but happy to answer any other questions. Thank you very much, Mr. Baskin. Ms. Klein, we'll give you two minutes. Yes. Just very briefly address the questions that have been raised. Starting with the last point. In Cope, the Supreme Court concluded that the legislative history doesn't dictate the answer as a textual matter. It's not a Chevron step one basis for invalidating the prior third-party employment regulation. But that's extremely different from saying that the agency can't consider, you know, the explicit discussion in the House and Senate committee reports in making the type of policy determinations that the Supreme Court anticipated. This is why the Supreme Court is saying, go consult with affected entities and inform your determination of which third-party workers are included on the basis of those consultations. And, of course, a critical question for the agency addressed at length in the rulemaking record was, what would the effect be not only on the workers but on the consumers? And that's why you have comments from AARP and lots of other consumer groups, all of which were taken into account. And there was substantial evidence for the department's findings that the new rule would not merely help the workers, which is, of course, very important, but would also increase the availability and, you know, access to home care workers. And, you know, this is reiterating the type of reasoning that the congressional committees had in the 1974 reports that accompanied the legislation. Just very briefly on Medicaid funding, the CDAP question, we did not frame this as a standing issue because we thought it was possible that some of the businesses could have some involvement with CDAP programs. Our point is that this suit, this is a general suit brought by the businesses and seeking an across-the-board invalidation of the third-party employment regulation. The specific concerns that the National Association of Medicaid Directors raised about the CDAP, the consumer-directed programs, said we're not talking about the circumstances in which businesses are the employers. We're talking instead about the circumstance where it's just the relationship between the Medicaid recipient or family member and the Medicaid program. And so our point is that, you know, there's no occasion for this court to opine on the specific application to consumer-directed programs because that would not provide any basis for the relief they're seeking here. Now, one of the amici said that the department had said that Medicaid would be treated as employers for purposes of the third-party regulation. Is that an announced position? Yes. No, that is correct. That's in both the final rule, but then I refer the court to docket number 27-5, which was our irreparable harm declaration in district court. And we didn't brief irreparable harm on appeal because the issue fell out when the district court converted the PI hearing to a merits hearing. But what it does do, this document, it provides additional information about what's been happening on the ground since the final rule was issued. And, you know, of course we had this long 15-month delay between the issuance of the rule and its effective date, plus more time since then in which HHS has provided guidance to state Medicaid programs. That's cited in that R27-5. Our Civil Rights Division has provided guidance. That's also cited in the same document. And also the document discusses what, for example, California has done. That has the largest by far consumer-directed program, and their legislature authorized payment of overtime under the Medicaid program up to 66 hours a week. And the reason this was in our irreparable harm declaration is that that was linked to the effective date of the final rule, so that money is not being spent right now. So even though, you know, we obviously did not seek a stay, we sought expedition, I don't want to suggest that there aren't very real problems on the ground that are undermining the implementation by a variety of private and public actors. Thank you. Thank you very much. The case is submitted.
judges: Griffith, Srinivasan, Pillard